IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| DENNIS MICHAEL MINTUN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CV-06-139-S-BLW |
| | ) | |
| vs. | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| RANDY BLADES, LARRY HYNES, | ) | |
| MONICA FORD, R. SIEBERT, PAUL | ) | |
| TORREZ, JO ELLIOT BLAKESLEE, | ) | |
| PRISON HEALTH SERVICES, | ) | |
| DAVID HAAS, STEVE SHERBONDY, | ) | |
| and CORRECTIONAL MEDICAL | ) | |
| SERVICES, | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| RANDY BLADES, MONICA FORD, | ) | |
| and DAVID HAAS, | ) | |
| | ) | |
| Cross-Claimants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PRISON HEALTH SERVICES, | ) | |
| | ) | |
| Cross-Claim Defendant. | ) | |
| _____ | ) | |

This case was reassigned to this Court for lack of all parties' consent to a United

States Magistrate Judge.  Pending before the Court are various motions ripe for

adjudication.  Having reviewed the record in this case, and having considered the

arguments of the parties, the Court finds that oral argument would not be particularly

**MEMORANDUM DECISION AND ORDER  1**

helpful.  Accordingly, the Court enters the following Order.

## BACKGROUND

Plaintiff, an Idaho Department of Correction inmate, alleges that Defendants failed to provide proper medical care and comfort items for serious, ongoing back and neck pain.  He brings his claims under the Eighth Amendment.  The Court has liberally construed Plaintiff's Complaint to include policy-based claims against the private health care entities that provide medical care at the prison.  Plaintiff is now housed in Oklahoma, a transfer unrelated to this case.

All Defendants have filed Motions for Summary Judgment (Docket Nos. 36, 42 & 4).  In addition, the Idaho Department of Correction (IDOC) Defendants have filed a Motion for Summary Judgment on their cross-claim against Prison Health Services (PHS) (Docket No. 45).  The Prison Health Services (PHS) Defendants have also filed a Motion for a Protective Order (Docket No. 65), which the Court shall address prior to addressing the pending Motions for Summary Judgment.

## PHS DEFENDANTS' MOTION FOR PROTECTIVE ORDER (Docket No. 65)

This Court earlier ordered the PHS Defendants to provide various contracts and polices related to their main contract to provide medical care to the IDOC during the time period at issue.  The PHS Defendants provided the documents in camera, asserting that they contained propriety and commercially sensitive information.  Good cause appearing, the Motion for a Protective Order is granted.

## STANDARD OF LAW GOVERNING

**MEMORANDUM DECISION AND ORDER  2**

## MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Material facts are those which may affect the outcome of the case. *See id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). In addition, the Court must be "guided by the substantive evidentiary

**MEMORANDUM DECISION AND ORDER  3**

standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

To state a claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). The Supreme Court has opined that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*

**MEMORANDUM DECISION AND ORDER  4**

> The Ninth Circuit has defined a "serious medical need" in the following ways: failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain; . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Deliberate indifference exists when an official knows of and disregards a serious medical condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer v. Brennan,* 511 U.S. 825, 838 (1994). Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim.  *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980).  A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).  If the defendants are able to show that medical personnel have been "consistently responsive to [the inmate's] medical needs, and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," a plaintiff's claims may be dismissed by summary

**MEMORANDUM DECISION AND ORDER  5**

judgment prior to trial. *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

The Eighth Amendment does not provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). A prison doctor's recommendation for a less costly treatment is not deliberate indifference unless the recommendation "was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998).

In *Estelle v. Gamble, supra,* Inmate Gamble suffered a back injury at work when a 600-pound bale of hay fell on him. Doctors and other medical providers at the prison prescribed rest and a variety of medications, including different pain relievers and muscle relaxers. Gamble argued that the medical providers were deliberately indifferent because they should have done more to diagnosis his back problem, such as x-raying his back. The Court disagreed, reasoning:

> Gamble was seen by medical personnel on 17 occasions spanning a
> 3-month period: by Dr. Astone five times; by Dr. Gray twice; by Dr. Heaton
> three times; by an unidentified doctor and inmate nurse on the day of the
> injury; and by medical assistant Blunt six times. . . . The doctors diagnosed
> his injury as a lower back strain and treated it with bed rest, muscle
> relaxants and pain relievers. Respondent contends that more should have
> been done by way of diagnosis and treatment, and suggests a number of
> options that were not pursued. The Court of Appeals agreed, stating:
> "Certainly an x-ray of (Gamble's) lower back might have been in order and

**MEMORANDUM DECISION AND ORDER  6**

other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." 516 F.2d, at 941. But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act. The Court of Appeals was in error in holding that the alleged insufficiency of the medical treatment required reversal and remand. That portion of the judgment of the District Court should have been affirmed.

429 U.S. at 97-98.

Similarly, in *Toguchi v. Chung*, *supra*, the Ninth Circuit underscored the difference between medical malpractice, which is not actionable under the United States Constitution, and deliberate indifference, which is an Eighth Amendment violation. Particularly, a plaintiff must show that the medical providers subjectively had knowledge of a serious risk to the plaintiff, and chose to disregard that risk. In *Toguchi*, Dr. Chung had treated Inmate Toguchi several times in the past before his untimely death in prison. The final time she treated him, she prescribed a course of medication that expert witnesses for the plaintiffs (Toguchi's surviving parents) opined caused a toxic level of drugs in his bloodstream, causing his death.

The Ninth Circuit, however, rejected the plaintiffs' expert witness opinions that the treating physician, Dr. Chung had been deliberately indifferent. To reach this result, the Court focused particularly on what Dr. Chung *knew* and *believed* before her allegedly wrongful acts or omissions. In response to an argument that Dr. Chung should have considered the prescription drug Cogentin an excessive risk to the deceased inmate's

**MEMORANDUM DECISION AND ORDER  7**

health, the Court opined: "Because she did not *believe* that Cogentin use presented a serious risk of harm to Keane, her conduct cannot constitute deliberate indifference." *Id.* at 1058 (emphasis added).  Similarly, the Court noted,

> *It does not matter whether Dr. Chung's assumptions and conclusions were reasonable.* Rather, *so long as she was not subjectively aware of the risk* that Keane could be suffering from a drug overdose, and disregarded that risk, she was not deliberately indifferent. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

*Id.* at 1060 (emphasis added).  Summary judgment for Dr. Chung was thus appropriate.

With the foregoing legal standards in mind, the Court now reviews Defendants' pending motions for summary judgment.

## PHS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF (Docket No. 36)

Plaintiff sues Dr. Jo Elliott-Blakeslee, Rona Siebert, Larry Hynes, and Prison Health Services, Inc.  The facts are taken from the Statements of Facts and supporting documents, Plaintiff's medical records, Plaintiff's responses to discovery, and his Complaint.

In January 2003, prior to Plaintiff's incarceration, he received an x-ray report from Dr. David Sonne.  It showed as follows:

> Clinical data: recent trauma. old motor vehicle accident injury to the spine. Findings: Extensive degenerative anterior lateral spondylosis involving the C5-6 and C6-7 levels without evidence of disc space narrow. The vertebral body heights, pedicles, processes, alignment, and paravertebral soft tissues appear normal.  Impression: Degenerative

**MEMORANDUM DECISION AND ORDER  8**

Spondylosis[1] at C5-6 and C6-7.

Plaintiff reported that he was taking two muscle relaxants prior to incarceration.

Plaintiff was incarcerated in April 2003.  In June 2003, non-defendant prison doctors treated Plaintiff for complaints of neck and back pain.  He was given Tizanidine (Zanaflex),[2] Methocarbamol,[3] and Nabumetone[4] at the beginning of June.  Near the end of June, the doctor prescribed 600 mg of Ibuprofen,[5] three times daily, to begin when he finished the Nabumetone.  The doctor discontinued the Methocarbamol prescription in response to Plaintiff's belief that it worsened the pain.

In early July 2003, he was examined again, denied a bottom bunk memo, and encouraged to become more physically active, exercise, lose weight, and continue

---

[1] Cervical spondylosis "is a general term for age-related wear and tear affecting the joints in your neck."  http://www.mayoclinic.com/health/cervical-spondylosis/DS00697.

[2] Tizanidine (generic name) or "Zanaflex relaxes the tense, rigid muscles caused by spasticity. It is prescribed for people with multiple sclerosis, spinal cord injuries, and other disorders that produce protracted muscles spasms." http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Zan1638.html&contentName=Zanaflex&contentId=648.

[3] Methocarbamol (generic name) or "Robaxin is prescribed, along with rest, physical therapy, and other measures, for the relief of pain due to severe muscular injuries, sprains, and strains."http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Rob1384.html&contentName=Robaxin&contentId=508.

[4] Nabumetone (generic name) or "Relafen is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs). Relafen works by reducing hormones that cause inflammation and pain in the body.  Relafen is used to treat pain or inflammation caused by arthritis."  http://www.drugs.com/relafen.html.

[5] Ibuprofen "[t]reats fever and pain, including pain caused by headache, toothache, arthritis, cold or flu, migraine, or menstrual cramps. This is a non-steroidal anti-inflammatory medicine (NSAID)."  http://www.pdrhealth.com/drugs/otc/otc-mono.aspx?contentFileName=DNX0161.xml&contentName=IBUPROFEN+200&contentId=2634.

**MEMORANDUM DECISION AND ORDER  9**

Ibuprofen.  In August 2003, Plaintiff's grievance regarding denial of the bottom bunk

memo was denied by PHS Defendant Larry Hynes and IDOC Defendant Monica Ford.  In

September 2003, he complained about increasing pain from degenerative disc disease and

arthritis.  In September, he first reported to a non-defendant doctor that Ibuprofen and

Tylenol were ineffective in treating his pain.  In response, the doctor prescribed Feldene.[6]

In October, denial of the bottom bunk memo was affirmed on administrative

appeal by IDOC Defendant Warden Randy Blades.  Also in October, Plaintiff slipped at

work and injured his back.  He was examined by a physician assistant and prescribed

Flexeril[7] based on the results of the examination.

Beginning in November 2003, Plaintiff did not complain of back or neck pain for a

period of over eight months.  In July 2004, he began to complain of back and neck pain

again.  A nondefendant doctor prescribed Ibuprofen for 60 days.  Plaintiff thereafter did

not complain of back or neck pain for a period of five months.

---

[6] Piroxicam (generic name) or "Feldene, a nonsteroidal anti-inflammatory drug, is used to relieve the inflammation, swelling, stiffness, and joint pain associated with rheumatoid arthritis and osteoarthritis (the most common form of arthritis). It is prescribed both for sudden flare-ups and for long-term treatment." http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Fel1173.html&contentName=Feldene&contentId=232.

[7] Cyclobenzaprine hydrochloride (generic name) or "Flexeril is a muscle relaxant prescribed to relieve muscle spasms resulting from injuries such as sprains, strains, or pulls. Combined with rest and physical therapy, Flexeril provides relief of muscular stiffness and pain." http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Fle1179.html&contentName=Flexeril&contentId=241.

**MEMORANDUM DECISION AND ORDER  10**

In late December 2004, Plaintiff complained that his back and neck pain were getting worse and that "Tylenol and Ibuprofen no longer erase the pain enough for comfort."  Plaintiff was scheduled for a doctor's visit the next day but was a "no show" for the callout.

Based on a series of Plaintiff's written Health Service Requests in late December and early January, Plaintiff saw a physicians assistant on January 13, 2005. X-rays were ordered, Feldene was prescribed, and a work limitation and bottom bunk memo were issued (good for one year).  In late January, new x-rays were taken, indicating no major abnormalities.

Defendant Dr. Blakeslee examined Plaintiff for the first time in early February 2005, and diagnosed him with chronic muscle spasms.  She gave him steroid injections in his back to help alleviate the pain.  Plaintiff alleges that he told Dr. Blakeslee that Flexeril made his pain worse, but she prescribed it anyway.

In early March, Plaintiff began complaining that none of the current medications had helped alleviate his pain, that the muscle relaxers made the pain worse, and that his pain was constant and severe.  Plaintiff requested Tylenol from the on-call nurses twice, and was given Tylenol and scheduled for a doctor's appointment.  He next requested "something with codeine" and an "Idle Memo."  He was given neither, because his scheduled doctor's appointment was the next day. On March 18, 2005, he saw Dr.

**MEMORANDUM DECISION AND ORDER  11**

Blakeslee, who diagnosed Plaintiff with fibromyalgia.  She prescribed Prozac,[8] Elavil or

Amitriptyline,[9] Ultram,[10] heat, and rest.  The regional director, Dr. Haggard, refused the

request for Ultram, an addicting, non-formulary drug.  Dr. Blakeslee prescribed Vicodin[11]

instead.  Dr. Blakeslee also wrote a Memo ordering Plaintiff an extra mattress, extra

pillow, and two extra blankets (to last for one year).

      Plaintiff did not complain of back and neck pain until May 25, 2005, when he

stated that Vicodin was helping his arthritis but not his back and neck pain.  He was

scheduled for an appointment with a doctor.  His doctor appointment occurred on June

23, 2005.  At that time, Dr. Blakeslee discontinued his Vicodin prescription due to his

---

[8]  Fluoxetine hydrochloride (generic name) or "Prozac is prescribed for the treatment of depression." http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Pro 1362.html&contentName=Prozac&contentId=478.  "Fluoxetine is also used to relieve symptoms of fibromyalgia and chronic pain." http://arthritis.about.com/od/prozac/Fluoxetine_Prozac _Dosage_ Side_Effects_Interactions_Warnings.htm.

[9]Amitriptyline hydrochloride (generic name) or "Elavil is used for: [t]he relief of depression. It may also be used to treat chronic pain and other conditions as determined by your doctor."  http://www.drugs.com/search.php?searchterm=Elavil&is_main_search=1.

[10]  Tramadol hydrochloride (generic name) or "Ultram is prescribed to relieve moderate to moderately severe pain.  Ultram can cause mental and physical addiction." http://www.pdrhealth. com/drugs/rx/rx-mono.aspx?contentFileName=Ult1467.html&contentName=Ultram&contentId =608.

[11] Vicodin's generic ingredients are hydrocodone bitartrate and acetaminophen.  "Vicodin combines a narcotic analgesic (painkiller) and cough reliever with a non-narcotic analgesic for the relief of moderate to moderately severe pain.  Vicodin can be habit-forming. If you take this drug over a long period of time, you can become mentally and physically dependent on it, and you may find the drug no longer works for you at the prescribed dosage." http://www.pdrhealth. com/drugs/rx/rx-mono.aspx?contentFileName=Vic1480.html&contentName=Vicodin&contentI d=626.

**MEMORANDUM DECISION AND ORDER  12**

complaints that it was not helping the back and neck pain, and she prescribed Amitriptyline and Darvocet.[12] He was ordered to see Dr. Blakeslee for follow up in two to three weeks.

On July 5, 2005, Plaintiff refused to take his Elavil prescription.  He was seen by a nurse and referred to a doctor.  On July 11, 2005, the PHS contract with IDOC ended.

Defendant Dr. Jo Blakeslee

Dr. Blakeslee treated Plaintiff from February 2005 to mid-July 2005.  During that time, she diagnosed him as having two different problems, and tried steroid injections for the first time, along with the muscle relaxer, Flexeril. While Plaintiff alleges that he told Dr. Blakeslee that Flexeril increased his pain, nothing in the record shows (1) that Flexeril can cause an increase of pain or (2) that Plaintiff had ever had Flexeril in combination with steroid injections.  Therefore, no subjective deliberate indifference can be inferred from her continuation of the Flexeril prescription.

Plaintiff also alleges that Dr. Blakeslee injected the steroids "above the area of pain," and when Plaintiff complained, she said that *she* was the doctor.  This action does not amount to deliberate indifference because Plaintiff has not shown that Dr. Blakeslee

_____

[12]  The generic ingredients of Darvocet-N are propoxyphene napsylate and acetaminophen.  Darvocet-N is a "mild narcotic analgesic prescribed for the relief of mild to moderate pain.  You can build up tolerance to, and become dependent on, these drugs if you take them in higher than recommended doses over long periods of time."  http://www.pdrhealth.com/ drugs/rx/ rx-mono.aspx?contentFileName=Dar1115.html&contentName=Darvocet-N& contentId=160.

**MEMORANDUM DECISION AND ORDER  13**

injected him in the wrong area (if, indeed, it was wrong) deliberately or with conscious disregard of a serious risk of harm to him.

When Plaintiff reported that the steroids and Flexeril were not effective, Dr. Blakeslee tried five different prescription drugs in the short period of time she treated him (not including Ultram, which was denied by the regional director). Plaintiff alleges that Dr. Blakeslee prescribed Prozac and Elavil to him so that he would be sedated and not complain that she was not treating him. Both Prozac and Elavil are used for pain relief. *See* Footnotes 8 & 9. These drugs were prescribed by Dr. Blakeslee *in conjunction with* heavier pain medications; therefore, Plaintiff is hard-pressed to argue that Dr. Blakeslee was trying to cover up nontreatment of him when, in fact, she *was* treating him. Dr. Blakeslee also authorized an extra mattress, extra pillow, and two extra blankets (to last for one year). At that time, Plaintiff still had a bottom bunk memo and a limited work memo and had just had a new x-ray series in January.

Plaintiff has failed to show that the course of treatment prescribed by Dr. Blakeslee exhibits deliberate indifference, especially when this case is compared to the standards for Eighth Amendment medical care articulated by the Ninth Circuit in *Toguchi v. Chung*. To the contrary, Dr. Blakeslee had recent x-rays to rely upon, and she tried various courses of conservative treatments over a short period of time, ending with prescriptions of narcotic medications. There is no indication in the record or from a review of the course of treatment that Dr. Blakeslee chose her course of treatment in conscious disregard of a serious risk of harm to Plaintiff. Dr. Blakeslee took reasonable measures to

**MEMORANDUM DECISION AND ORDER  14**

diagnose and address Plaintiff's problems, and it cannot be said that her treatment of Plaintiff "was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d at 989.  As a result, there is no deliberate difference.  Rather, Plaintiff's complaints amount to a difference of opinion with his medical provider, which is not actionable under the Eighth Amendment.  Dr. Blakeslee is entitled to summary judgment on the claims against her as a PHS contractor or employee.

Defendant Rona Siebert

Plaintiff alleges that Rona Siebert, a nurse, seemed to have been acting as Director of the Medical Department for PHS.  Plaintiff sent concern forms sent to the "Medical Director" on June 21, 2005, and June 22, 2005, both of which were answered by Defendant Siebert.  Plaintiff complained about lack of treatment. On June 23, 2005, Siebert responded by using an ink stamp that stated: "Unfortunately your question or concern requires an evaluation or a decision by one of our providers.  Please submit a Health Services Request (Kite) to obtain this evaluation or decision."[13]   On July 1, 2005, she responded by writing, "You will need to discuss this with a provider - Submit an HSR and go to sick call."

The law is clear that "[t]here is no legitimate claim of entitlement to a [prison] grievance procedure."  *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988), *cert. denied*,

---

[13]  *See Complaint Exhibit 9* (Docket No. 3).

**MEMORANDUM DECISION AND ORDER  15**

488 U.S. 898 (1988); *see Sandin v. Connor*, 515 U.S. 472 (1995) (noting that liberty

interests are generally limited to freedom from restraint).  As one court explained,

"liability under § 1983 must be based on active unconstitutional behavior and cannot be

based upon a 'mere failure to act.'"  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

Rather,  where defendants' "only roles in [a civil rights] action involve the denial of

administrative grievances or the failure to act. . . they cannot be liable under § 1983."  *Id*.

Nurse Siebert reviewed Plaintiff's written complaints and referred him to a

medical doctor.  Nothing shows that she did so in conscious disregard for his health

issues, rather than in an effort to help him resolve the issues.  There is no constitutional

right to a grievance system, and therefore Nurse Siebert's failure to do something more in

this context is not actionable.  As a result, Plaintiff's factual allegations against Defendant

Siebert fail to state a claim upon which relief can be granted, and Siebert is entitled to

summary judgment as a PHS employee.

<u>Defendant Larry Hynes</u>

Al the time of the alleged incidents during the PHS medical contract with IDOC,

Larry Hynes was a PHS administrator.[14]  Plaintiff has alleged that Larry Hynes was

responsible for creating policy and authorizing medical care.  Even if that is the case,

Plaintiff must show that Larry Hynes had direct participation in the denial of Plaintiff's

medical care.  This, Plaintiff has not shown.  Plaintiff has brought forward no

---

[14]  *See Affidavit of Andrea Bickley*, ¶ 10 (Docket No. 44-4).

**MEMORANDUM DECISION AND ORDER  16**

documentation or testimonial evidence that Hynes knew of Plaintiff's complaints about

inadequate health care or made any decisions related to Plaintiff's health care.

In *Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989), the court explained:

> Liability under section 1983 arises only upon a showing of personal
> participation by the defendant.  *Fayle v. Stapley*, 607 F.2d 858, 862 (9th
> Cir.1979).   A supervisor is only liable for constitutional violations of his
> subordinates if the supervisor participated in or directed the violations, or
> knew of the violations and failed to act to prevent them. There is no
> respondeat superior liability under section 1983.

*Id*. at 1045.

Plaintiff also alleges that Larry Hynes denied him a bottom bunk memo in 2003

when he did not grant relief on Plaintiff's grievance.  As stated above, the law is clear that

"[t]here is no legitimate claim of entitlement to a [prison] grievance procedure." *Mann v.*

*Adams*, 855 F.2d at 640.  Rather, "liability under § 1983 must be based on active

unconstitutional behavior and cannot be based upon a 'mere failure to act.'" *Shehee v.*

*Luttrell*, 199 F.3d at 300.  Where defendants' "only roles in [a civil rights] action involve

the denial of administrative grievances or the failure to act. . . they cannot be liable under

§ 1983." *Id*.

The facts in the record show that Hynes had no active unconstitutional behavior of

his own that could be actionable under § 1983.  The prison doctor made an informed

medical decision not to issue a bottom bunk memo, but to prescribe medication, increased

physical activity, exercise, and weight loss.  In denying the grievance, Hynes stated:

> You have been seen and evaluated by our Providers who do not
> believe you have a condition which warrants a bottom bunk memo at this

**MEMORANDUM DECISION AND ORDER  17**

time.  Unfortunately, there are only a finite number of lower bunks and
people with medical need for them are given them.  Follow the provider's
recommendations and increase your daily activities to see if this helps your
condition.

*Grievance Attached to Complaint* (Docket No. 3, p. 11).

It is evident from this response that Hynes relied on the doctor's report on

Plaintiff's condition.  Further, he did not foreclose the possibility of a bottom bunk, but

told Plaintiff to follow the instructions of the doctor to see if his condition improved.  No

subjective knowledge and conscious disregard of any serious risk is found in the record.

Because Plaintiff has not shown that Hynes was deliberately indifferent, Hynes is entitled

to summary judgment.

Defendant Prison Health Services, Inc.

In order to proceed against PHS as an entity, Plaintiff must state facts meeting the

test articulated in *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658,

691-94 (1978).[15]  Under *Monell*, requisite elements of a § 1983 claim against a

municipality or private entity performing a state function are the following: (1) the

plaintiff was deprived of a constitutional right; (2) the entity had a policy or custom; (3)

the policy or custom amounted to deliberate indifference to plaintiff's constitutional right;

and (4) the policy or custom was the moving force behind the constitutional violation.

*See Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11

(9th Cir. 2001).

---

[15]  *See, e.g., Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (cataloguing
circuit court cases applying *Monell* to private entities).

**MEMORANDUM DECISION AND ORDER  18**

Plaintiff sought discovery on any PHS policies or contracts that would support his theory of recovery against PHS.  The Court permitted Plaintiff to discover any such policies or contracts, but allowed PHS to submit the documents in camera for security and confidentiality purposes. PHS submitted the Affidavit of Douglas Carr to explain the scope of the 710 pages of documents produced.  *See Affidavit of Douglas Carr* (Docket No. 64-2).  Carr is the special claim consultant for PHS.  Carr declared as follows:

> [I]t is PHS' policy, with respect to medical treatment and medical care, to rely upon the professional judgment and recommendations of the on-site health care professionals in a case-by-case and patient-by-patient basis.  PHS does not make treatment decisions that are universally applicable; indeed, it would be imprudent, if not impossible, given the variety of health care needs of patients throughout the country, for PHS to attempt to institute nationwide treatment policies, particularly since PHS is not licensed to practice medicine.  While PHS administers the business side of providing health care to institutions nationwide, it is neither designed nor licensed to make health care decisions, but instead, entrusts those decisions to the sound clinical judgment of its professional trained practitioners.

*Id.*, ¶ 3.

Here, Plaintiff alleges that PHS has at least an unwritten policy that its medical care providers use only very conservative and cost-effective diagnostic tools, medication, and treatment, regardless of whether a more expensive procedure or prescription is necessary.  However, Plaintiff has brought forward no admissible evidence to show that the medical care rendered by the specific PHS medical providers who treated him was inappropriate under the constitutional standard.  As a result, even if PHS had a policy that provided that its practitioners generally should use the most conservative treatment and diagnostic tools for inmate health care or one that even prohibited more expensive forms

**MEMORANDUM DECISION AND ORDER  19**

of diagnosis and treatment, as Plaintiff alleges, such a policy did not *cause* the individual

health care providers to provide constitutionally deficient treatment, because the Court

finds that the treatment rendered by PHS met Eighth Amendment standards as set forth in

*Estelle v. Gamble*.

"The fact that medical care given is not the best that money can buy does not

amount to deliberate indifference to serious medical needs."  *Clark v. Adams*, 2006 WL

1305164,*4 (D. Tex. 2006) (citing *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992)).  A

recommendation for a less costly treatment for an inmate is not deliberate indifference

unless  the recommendation "was so inadequate that it demonstrated an absence of

professional judgment, that is, that no minimally competent professional would have so

responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d at 989.

Here, Plaintiff's conservative course of treatment during the PHS contract was

appropriate and met the Eighth Amendment standard because Plaintiff has not shown that

the care was so inadequate that it demonstrated an absence of professional judgment.  As

a result, PHS is entitled to summary judgment.


### CMS DEFENDANTS' MOTION TO DISMISS OR MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF (Docket No. 42)

The Court will treat the CMS Defendants' alternative motion as a summary

judgment motion rather than a motion to dismiss.  Plaintiff is on notice of the summary

judgment rule requirements by Defendants' statement of the law in its briefing and by the


**MEMORANDUM DECISION AND ORDER  20**

"Notice to Pro Se Litigants of the Summary Judgment Rule Requirements," sent to Plaintiff with each summary judgment motion that has been filed in this action.

CMS took over the medical contract at the IDOC on July 11, 2005. Dr. Blakeslee and Rona Siebert, former contractors or employees of PHS, remained on at the prison, contracting with or becoming employed by CMS at that time. Additional CMS Defendants are Paul Torres, Steven Sherbondy, and Correctional Medical Services, Inc.

### Defendant Jo Blakeslee

On October 13, 2006, Dr. Blakeslee provided Plaintiff with a Medical Disposition/Response, informing Plaintiff that his s-rays were negative for fractures or dislocations and showed only mild degenerative arthritis.[16] Plaintiff was treated by other CMS doctors before and after this date. Dr. Blakeslee's information to Plaintiff reflects the information the radiologist wrote in his report. Plaintiff was not seeking treatment from Dr. Blakeslee at that time, nor was she providing treatment, but simply relaying another doctor's x-ray report to Plaintiff. Because there are no facts showing that she had subjective knowledge of, or that she consciously disregarded, a serious risk regarding Plaintiff's health with her action on that particular date, she is entitled to summary judgment on the claim against her as a CMS contractor or employee.

### Defendant Rona Siebert

Plaintiff identifies only one specific action Rona Siebert took after July 11, 2005,

---

[16] *See Affidavit of Dr. April Dawson, Exhibit L* (Docket No. 42-3); *Plaintiff's Answers to CMS Interrogatories, Int. No. 4* (Docket No. 33).

**MEMORANDUM DECISION AND ORDER  21**

while she was a CMS employee.  Plaintiff alleges that on August 24, 2005, Siebert

disagreed with his argument that he should not have been charged for a medical visit.  He

alleges that she made him pay for the visit "to attempt to discourage Plaintiff from

seeking medical care." *Plaintiff's Answers to PHS Interrogatories, Int. No. 11* (Docket

No. 35).  However, Plaintiff admits that degenerative disc disease is *not* considered a

chronic condition for which co-pays are not required.  *Plaintiff's Answers to CMS*

*Interrogatories, Int. No. 4* (Docket No. 33).  Therefore, Plaintiff has produced no

evidence that Defendant Siebert singled out his care in order to discourage him from

seeking medical care; rather, Siebert was acting in accordance with the medical

department's regular co-payment procedure.

<u>Defendant Paul Torres and Defendant Steve Sherbondy</u>

There are no factual allegations in the Complaint (or elsewhere in the record that

the Court can see) specifying any particular acts or omissions of CMS Defendants Paul

Torres or Steven Sherbondy.  Vague and conclusory allegations of official participation in

civil rights violations are not sufficient to state a § 1983 claim. *See Ivey v. Board of*

*Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).  As a result, these claims

are subject to summary judgment.

<u>Defendant Correctional Medical Services, Inc</u>.

On July 11, 2005, CMS took over Plaintiff's care from PHS.  The relevant PHS

history is as follows: on July 5, 2005, Plaintiff refused to take his Elavil prescription.  He

was seen by a nurse and referred to a doctor.  On July 10, 2005, Plaintiff completed a

**MEMORANDUM DECISION AND ORDER  22**

Health Services Request Form stating that his current medication was not helping to ease the back pain, and the pain in his lower back seemed to be in the kidney area and probably should be checked.  Plaintiff saw an unidentified health care provider on July 11, 2005, who noted his complaints, including that Darvocet did not relieve his pain, and assessed his situation as "alteration in comfort." (At that time, Plaintiff's Darvocet prescription, which was written for 5/24/05 through 8/24/05, was still in effect.)

On August 9, 2005, Plaintiff complained of back pain, neck pain, and pain near his kidneys.  He saw a physician assistant, David Tomey, on September 7, 2005.  A urine test was performed to check his kidney function, and the results were normal.  The physician assistant diagnosed the back pain as mechanical in nature.  He reviewed the x-ray report of January 31, 2005, noting that there was evidence of degenerative joint disease but the x-ray was otherwise normal.

On September 22, 2005, Plaintiff complained of continuing back pain.  On September 22 or 23, 2005, he was seen by an unknown medical provider, who noted that the medications were not helping.  Plaintiff was not in any obvious signs of distress.  He was referred to a physician assistant or doctor.  On September 22, 2005, a physician assistant prescribed Ultram for Plaintiff's back and neck pain.[17]

On October 26, 2005, a different physician's assistant, Tom Hengst, examined

---

[17]  Plaintiff alleges that he told this medical provider on September 22, 2005, that Ultram was not working, and the medical provider prescribed Ultram, anyway; however, the Medication Administration Record shows that his first dosage of Ultram was not until September 26, 2005 (Docket No. 42-3, p. 18).

**MEMORANDUM DECISION AND ORDER  23**

Plaintiff.  Plaintiff told the physician assistant that his pain was getting intolerable and that it really hurt to lie supine.  The physician assistant noted that Plaintiff was uncooperative and did appear uncomfortable lying supine.  During the examination, the physician assistant observed that Plaintiff was able to walk on his toes and heels without difficulty.  The physician assistant wrote, "patient has been seen many times - no hard findings."  Plaintiff told this physician assistant that the other physician assistant, PA Tomey thought he might need to see a neurologist.  PA Hengst wrote, "Without hard findings I don't see the need for a downtown appt. - but will schedule with PA Tomey at patient insistence!"  During these two visits, Plaintiff's Ultram prescription continued.

On November 29, 2005, Plaintiff saw Dr. Maria Yurasek for back pain.  She examined him and found that he was in no acute distress and had no spinous percussion tenderness.  She ordered a urinalysis, which came back normal.  She diagnosed him with muscle spasms.  She prescribed Robaxin and Naprosyn, in addition to his Ultram, and instructed Plaintiff to ice the area as needed.  She wrote "Doubt thoracic spine MRI/CT (which is what he wants) will give us any meaningful data, but may need to consider it in the future."

Plaintiff next saw Dr. Yurasek two months later, on January 23, 2006, complaining of back pain and fibromyalgia.  Dr. Yurasek's examination produced "no new findings." She reordered his Robaxin and renewed his bottom bunk memo and ice memo. The notes reflect that Plaintiff said that Robaxin was helping somewhat, but Plaintiff alleges that he told her Robaxin was making the pain worse.  Dr. Yurasek also provided him with a work

**MEMORANDUM DECISION AND ORDER  24**

limitation, two extra blankets, a double mattress, and extra pillows.  She wrote, "will hold off on MRI for now."

CMS alleges that Plaintiff did not seek medical care *for pain* between late January 2006 to August 2006.  Plaintiff alleges that CMS lost his Medical Request Forms (and, by implication, he is asserting that CMS did not act on them) from February 2006 through August 2006.  CMS has provided pill call records showing that Plaintiff received Ultram in January 2006, that he received Ultram and Robaxin from February through March 2006, that he received Robaxin in April 2006, that he received Wellbutrin (for depression) in June 2006, and that he received Wellbutrin and Celexa in July and August 2006.  There are no missing doctor notations between January 23, 2006, and June 9, 2006, because the doctor's notations from these dates both appear on the same page, in chronological order (Docket No. 42-3, p. 43).  On June 9, 2006, Plaintiff sought help for depression and was prescribed Wellbutrin, and in July 2006, Celexa was added to Wellbutrin.  However, there are no copies of any Health Services Request Forms for the June and July visits.  It is possible that some Health Services Request Forms are missing from this time period, but there is no additional proof that if he had submitted one, he was not seen, because doctors' notations from this time period indicate he was seen twice notwithstanding the absence of corresponding Health Services Request Forms for those visits.

Plaintiff submitted an undated Health Services Request Form complaining of midback pain, and he was seen by a nurse on August 10, 2006.  The nurse referred him to

**MEMORANDUM DECISION AND ORDER  25**

the "OPC" for pain control.

On September 1, 2006, Plaintiff was treated by a nondefendant doctor, April Dawson, M.D., for continued complaints of back pain. He stated he was on only Tylenol at that time. During the examination, the doctor observed that Plaintiff appeared healthy, moved and walked without difficulty, and was able to position himself on the examination table comfortably. Plaintiff's neck examination revealed muscular tension and a decreased range of motion. His spine was normal in appearance and non-tender. The doctor concluded that the source of Plaintiff's back pain was muscular. To confirm the diagnosis, the doctor ordered x-rays of his thoracic spine and a urinalysis. She also prescribed Disalcid[18] for pain for 60 days and encouraged Plaintiff to use exercises and stretches to relieve his pain.

On September 15, 2006, x-rays of Plaintiff's thoracic and lumbar spine were taken. The x-rays revealed mild degenerative arthritic changes, but were negative for fractures or dislocations. As discussed above, Dr. Blakeslee informed Plaintiff in writing that the x-rays were negative for fractures or dislocations and showed only mild degenerative arthritis.

Plaintiff's Disalcid prescription lasted until November 1, 2006. On November 7, 2006, Plaintiff reported that he wanted his medications renewed and had additional pain.

---

[18] Disalcid is "a nonsteroidal anti-inflammatory drug, [that] is used to relieve the symptoms of rheumatoid arthritis, osteoarthritis (the most common form of arthritis), and other rheumatic disorders (conditions that involve pain and inflammation in joints and the tissues around them)." http://www.drugs.com/search.php?searchterm=disalcid&is_main_search=1.

**MEMORANDUM DECISION AND ORDER  26**

He was referred to Dr. Partridge for a visit on November 9, 2006. Plaintiff saw nondefendant doctor, Christopher Partridge, M.D., on November 9, 2006. He ordered additional x-rays of Plaintiff's lumbar spine, thoracic spine, and sacroiliac joints. These x-rays, read by nondefendant doctor Milroy Emmanuel, M.D., showed early degenerative arthritic changes, but that no other abnormalities were present, and that the intervertebral disc spaces were well-maintained and the pedicles intact.

On December 18, 2006, Plaintiff requested that his back, neck, and fibromyalgia memos be extended. His request was granted, and he received a one-year bottom bunk memo, a one-year work limitation, and a six month ice memo.

On March 5, 2007, Plaintiff submitted a Health Services Request complaining that Ultram was not controlling his pain. He was seen the same day and referred to a physician. Plaintiff saw a nondefendant physician, Dr. Schmidt, on March 9, 2007. Dr. Schmidt concluded that an MRI was not medically indicated. Dr. Dawson has submitted her expert medical opinion that "[a]t no time has plaintiff required further diagnostic tests, such as an MRI, and at no time was surgery medically indicated." *Affidavit of April Dawson, M.D.*, ¶ 21 (Docket No. 42-3).

Plaintiff did not request medical care for neck or back pain between March 7, 2007, when he last saw the doctor, and October 4, 2007, the approximate date he was transferred to an Oklahoma prison. Neither was he on any back or neck pain medication at that time. For purposes of CMS Defendants' liability, CMS Defendants cannot be liable if they were not provided with an opportunity to treat Plaintiff after March 9, 2007.

**MEMORANDUM DECISION AND ORDER  27**

Therefore, the CMS Defendants are granted summary judgment for the time period after March 9, 2007.

Plaintiff has not brought forward sufficient admissible evidence to show (1) an MRI was necessary prior to March 9, 2007, (2) if an MRI was necessary and not ordered prior to March 9, 2007, it was the result of deliberate indifference rather than medical negligence, or (3) that CMS had a written or unwritten policy that its medical care providers were prohibited from ordering diagnostic tests beyond x-rays or had any other policy that amounted to deliberate indifference to a serious risk of harm to him.  Rather than providing admissible evidence, he has referred to new medical records which are not a part of the Court's record, and he has provided a list of witnesses and their proposed testimony.  These items are insufficient to withstand summary judgment.  Unless Plaintiff has an affidavit from these witnesses, it is unknown what they might say at trial. Because the CMS Motion for Summary Judgment was filed alternatively as a motion to dismiss, the Court will conditionally grant the motion for summary judgment as to Correctional Medical Services, Inc., and allow Plaintiff to bring forward any admissible evidence he may have.  After that time, CMS may file a response.  The Court will then re-evaluate the Motion for Summary Judgment and either enter a final granting or denial of the Motion.

## IDOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF (Docket No. 44)

The IDOC Defendants, Randy Blades, Monica Ford, and David Haas assert

**MEMORANDUM DECISION AND ORDER  28**

entitlement to summary judgment on a number of grounds.

<u>Statute of Limitations - Defendants Randy Blades and Monica Ford</u>

The length of the statute of limitations for a civil rights action is governed by state law. *Wilson v. Garcia*, 471 U.S. 261 (1985) (later overruled only as to claims brought under the Securities Exchange Act of 1934, not applicable here). Idaho Code § 5-219 provides for a two-year statute of limitations for professional malpractice, personal injury, and wrongful death actions. Federal civil rights actions arising in Idaho are governed by this two-year statute of limitations.

Monica Ford and Randy Blades denied Plaintiff's grievance and grievance appeal regarding his request for a bottom bunk on August 25, 2003, and October 17, 2003, respectively. Plaintiff's statute of limitations began running the day after his grievance was denied, on October 18, 2003, and ended two years later, on October 18, 2005. *See Complaint, Exhibit 2* (Docket No. 3, p. 11). Plaintiff's Complaint was constructively filed under the mailbox rule[19] on April 5, 2006, approximately six months too late. As a result, Plaintiff's claims arising from the grievance and denial of the bottom-bunk memo in 2003 are barred by the statute of limitations.

<u>Remaining Allegations Against Defendant Randy Blades</u>

Plaintiff generally alleges that Warden Blades "supervises, determines, and

---

[19]Prisoners are usually entitled to the benefit of the "mailbox rule," which provides that a legal document is deemed filed on the date a petitioner delivers it to the prison authorities for filing by mail, rather than the date it is actually filed with the clerk of court. *See Houston v. Lack*, 487 U.S. 266 (1988).

**MEMORANDUM DECISION AND ORDER  29**

enforces policies which may have denied proper care, treatment, and comfort to Plaintiff."
*Plaintiff's Answer to IDOC Interrogatories, Int. No. 3* (Docket No. 34).  An Eighth
Amendment claim cannot be based merely on a person's position as a supervisor because
there is no respondeat superior liability under § 1983.  *Taylor v. List*, 880 F.2d at 1045.
The Court has already determined that there was no deliberate indifference in the
conservative course of treatment rendered to Plaintiff during period of time when PHS
provided the health care at the IDOC from June 2003 to July 11, 2005.

On June 21, 2005, Plaintiff sent an Inmate Concern Form to Warden Blades,
complaining to him for the first time as follows:

> For 2 years I've been trying to get my back pain taken care of.  I have
> degenerated discs (verified by outside medical staff before my arrest) that
> ultimately needs surgery.  I am getting no help from medical - and tonight I
> was ordered to go to pill call or get a DOR - for medication that does not
> work.  I was prescribed a "psych" med (Elavil) which keeps me drowsy -
> but does nothing for pain but had to give up working at Bob Barker because
> of my medication - which I repeat does not work.

*Complaint, Exhibit 8* (Docket No. 3, p. 15).  On June 27, 2005, Warden Blades wrote
back, "I will communicate your concerns and perhaps re-evaluate with CMS."

Blades' response anticipated that CMS would be taking over the medical contract
on July 11, 2005.  Because the Court has not found deliberate indifference to a serious
medical need of Plaintiff through July 11, 2005, and a new medical care provider was
taking over treatment of Plaintiff as of July 11, 2005, Blades had no reason to believe that
Plaintiff's health care into the future by new provider CMS would be inappropriate.
Plaintiff points to no additional complaint made to Blades during the course of CMS'

**MEMORANDUM DECISION AND ORDER  30**

treatment after July 11, 2005, that would have alerted Blades to a continuing problem

with Plaintiff's medical care.  "[P]rison officials are entitled to rely on the opinions,

judgment, and expertise of prison medical personnel in determining the course of

treatment that is medically necessary and appropriate for an inmate."  *Wynn v. Mundo*,

367 F.Supp. 2d 832, 337-38 (D. N.C. 2005).  However, if an inmate continues to

complain after he has had a cursory initial medical examination, officers who ignore the

continuing complaints may be deliberately indifferent.  *Cooper v. Dyke*, 814 F.2d 941,

945-46 (4th Cir. 1987).

Because there were no further complaints to Blades by Plaintiff, there is no causal

link between Blades' action or inaction and Plaintiff's alleged harm by CMS.  As a result,

the remaining claims against Blades are subject to summary judgment.

<u>Defendant David Haas</u>

Defendant David Haas is not a medical provider but was an IDOC administrator

during the time period at issue.[20]  Plaintiff alleges that Haas "oversaw policy and

procedure of PHS at IDOC," and that he ignored personal complaints by Plaintiff about

lack of proper medical care."  *Plaintiff's Responses to IDOC Defendants' Interrogatories,*

*Int. No. 5* (Docket No. 34).

Plaintiff has produced no evidence showing that David Haas had any personal

knowledge of Plaintiff, his medical care, or his complaints.  Vague and conclusory

allegations of official participation in civil rights violations are not sufficient to state a §

---

[20] *See Jones Affidavit*, ¶ 2 (Docket No. 44-5).

**MEMORANDUM DECISION AND ORDER  31**

1983 claim. *See Ivey v. Board of Regents of Univ. of Alaska*, 673 F.2d at 268.  Further, a

state actor cannot be liable simply because of the position he holds because there is no

respondeat superior liability under § 1983.  *Taylor v. List*, 880 F.2d at 1045.  As a result,

the claims against David Haas are subject to summary judgment.

## IDOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON CROSS-CLAIM AGAINST PHS (Docket No. 45)

The Court now addresses the IDOC Defendants' Motion for Summary Judgment

on their cross-claim against PHS, Inc.  The IDOC Defendants assert entitlement to

summary judgment on the issues (1) that the contract between the IDOC and PHS

requires indemnification and (2) that PHS breached its duty to defend the IDOC

Defendants with regard to Plaintiff's Complaint.

The IDOC Defendants first argue that PHS is required by its contract with the

IDOC to indemnify them for any award that arises from the IDOC's decision to refuse

Plaintiff a bottom bunk memo in 2003.  The Court has determined that this claim is barred

by the statute of limitations and that it has no merit as an Eighth Amendment claim.  As a

result, both parties agree that the indemnification portion of the Motion is moot.  *See*

*Geary v. Scharbrough*, 2007 WL 2901695 (D. Ind. 2007) ("where, as here, contract

provides for indemnity against liability, and not merely against loss or damage, the duty

to indemnify is triggered either when the party seeking indemnity 'pays a claim or its

liability in an underlying claim becomes fixed'"); *R.W. Beck and Associates, Inc. v. Job*

*Line Constr.*, Inc., 831 P.2d 560, 563 (Idaho Ct. App. 1992) (one of the prima facie

**MEMORANDUM DECISION AND ORDER  32**

elements of indemnity is "actual liability of an indemnitee to a third party").

Second, the parties disagree as to whether the contract requires PHS to defend the IDOC on Plaintiff's claims against them for refusing to provide a bottom bunk memo. The IDOC Defendants argue that their decision relied upon a medical decision that a bottom bunk memo was not necessary, and, therefore, the claims against them "aris[e] out of the provision of health care services, " as the contract specifies.  PHS, contrarily, argues that the IDOC Defendants do not necessarily have to deny a bottom bunk memo based on medical data, but it could choose to appropriate bed assignments any way it chose, including based on nonmedical criteria, making the claims in the Complaint non-medical issues.

The contract provision at issue provides as follows:

> Contractor [PHS] will, up to the limits of the Contractor's applicable professional liability insurance, hold harmless, indemnify and defend the Department, the State of Idaho and their agents, employees or officers of the State of Idaho from any and all suits, actions, losses, liability, damages (not including punitive damages), expenses, reasonable attorney fees (not including salaries of attorneys regularly employed by the State of Idaho), judgments or settlements incurred by the Department, the State of Idaho or their agents, employees or officers arising out of the provision of health care services by the Contractor, its employees, or subcontractors under the contract, including negligent or intentional acts of omission or commission, and professional malpractice.  Contractor will not be responsible for any claim arising as a result of the Department or its employees or agent preventing an inmate from receiving medical care that has been ordered by Contractor, and negligent or intentional acts of omission or commission, provided this sub-section shall not be construed as a contract by the State to indemnify Contractor.

*Jones Affidavit Exhibits (IDOC-PHS Contract)* (Docket No. 44-10, p.4).

**MEMORANDUM DECISION AND ORDER  33**

The parties agree that the contract between PHS and the IDOC is governed by

Idaho law.  Whether a contract is ambiguous is a question of law to be determined by the

court.  *Navarrete v. City of Caldwell*, 949 P.2d 597, 599 (Idaho Ct. App. 1997).  In

*Navarrete*, the Court summarized Idaho law on ambiguities as follows:

> A contract is ambiguous, as a matter of law, if it is reasonably subject to
> conflicting interpretations. *Badell v. Badell*, 122 Idaho 442, 445, 835 P.2d
> 677, 680 (Ct.App.1992).  If the contract is ambiguous, its meaning turns on
> the underlying intent of the parties. Intent is a question of fact to be
> determined by the fact finder in light of the language of the entire
> agreement, the parties' conduct, the course of prior negotiations and other
> extrinsic information. *Id.* If a contract is unambiguous, the determination of
> the contract's meaning and legal effect is a question of law, and the meaning
> of the contract and intent of the parties must be determined from the plain
> meaning of the contract's own words. *City of Idaho Falls v. Home Indem.
> Co.*, 126 Idaho 604, 607, 888 P.2d 383, 386 (1995). Oral and written
> statements are inadmissible to contradict or vary unambiguous terms. *In re
> Wilhite v. Northwest Yearly Meeting Pension Fund*, 128 Idaho 539, 545,
> 916 P.2d 1264, 1270 (1996).

*Id.*, 949 P.2d at 599.

The threshold question, then is whether the clause, "*arising out of the provision of*

*health care services by the Contractor, its employees, or subcontractors under the*

*contract, including negligent or intentional acts of omission or commission, and*

*professional malpractice*" unambiguously includes Plaintiff's claim that Randy Blades

and the other individual nonmedical IDOC Defendants refused to issue Plaintiff a bottom

bunk memo when he allegedly had a medical need for such a memo.

There is no Idaho case that specifically defines the phrase, "arising out of" or

determines whether it is ambiguous in this context.  Therefore, the Court looks to other

**MEMORANDUM DECISION AND ORDER  34**

jurisdictions to answer this question.  In *Borough of Kennett Square v. First Mercury*

*Syndicate, Inc*., 1998 WL 401603 (D. Pa. 1998), where the issue was the meaning of

"arising out of the activities and operations of a law enforcement agency," the court

observed:

> Other courts, which have construed the phrase "arising out of" the
> activities and operations of a law enforcement agency, have interpreted the
> phrase broadly and comprehensively. In *Murdock v. Dinsmoor*, 892 F.2d 7,
> 8 (1st Cir.1989), the Court of Appeals for the First Circuit held that an
> insurance company did not have a duty to defend the town of Gilsum,
> because the actions complained of, kidnaping and battery by members of
> the Gilsum police force fell within the exclusion to coverage for hazards
> "arising out of" operations of the police department. The court held that the
> words, "arising out of" mean "originating from", "growing out of",
> "flowing from", "incident to" or "having connection with." *Id*. Based on
> these definitions, the court concluded that the phrase was not ambiguous
> and that the "exclusion clause covered not only police operations per se, but
> also anything incident to or having connection with such operations." *Id*.

1998 WL 401603 at *7.  The meaning assigned to "arising out of" in *Kennett Square* is a

reasonable determination on the issue ambiguity.  This meaning supports the IDOC's

position that denial of the grievance regarding the bottom bunk memo "arises out of,"

"flows from," "grows out of," or "is incident to" "the provision of health care services,"

which would include evaluation of whether a medical need for a bottom bunk bed existed.

There are two specific exceptions to the duty to defend and indemnify in the

contract provision at issue.[21]  The first exception is that PHS is not "responsible for any

claim arising as a result of the Department or its employees or agent preventing an inmate

---

[21]  *See Karin D. Jones Affidavit, Exhibit D (PHS-IDOC Contract Excerpt)* (Docket No.
44-5).

**MEMORANDUM DECISION AND ORDER  35**

from receiving medical care that has been ordered by [PHS]." This is not at issue, as PHS had admitted that it is not aware of any interference with Plaintiff's medical care by an IDOC employee. *Jones Affidavit (PHS Discovery Responses)*, *Request for Admission No. 8* (Docket No. 44-5, p. 41).

The second contract exception is that PHS is not responsible for "negligent or intentional acts of omission or commission [of IDOC employees]." This appears to be the provision under which PHS is refusing to accept tender of defense of the IDOC Defendants. However, there is no indication of negligent or intention acts of omission or commission on the part of the IDOC Defendants from the face of the Complaint and its attachments on the bottom bunk claim, *given the known procedure PHS and IDOC use for the evaluation of medical bottom bunk requests*. "The duty to defend arises upon the filing of a complaint whose allegations, in whole or in part, read broadly, reveal a potential for liability that would be covered by the insured's policy." *Hoyle v. Utica Mut. Ins. Co.*, 137 Idaho 367, 371-72, 48 P.3d 1256, 1260-61 (2002). There is no indication that Idaho law would not require one who is not an insurer, but who has entered into a contract to defend and indemnify, to similarly determine at the outset of a legal action whether a defense should be made, based on the clear language of the defense provision, the exclusions contained in the contract, and a review of the Complaint.

Here, the facts are undisputed, and a "broad reading" of the duty-to-defend provision of the contract is not necessary; simply a plain reading will do. The genesis of the claim at issue is that Plaintiff disagreed with his "inability to get a bottom bunk

**MEMORANDUM DECISION AND ORDER  36**

memo." *Plaintiff's Grievance attached to Complaint* (Docket No. 3, p. 11).  During the

time in question, "bottom bunk memos" were PHS forms originating in the medical unit,

were issued by medical staff, and were sent to IDOC staff to be administered.[22]  Plaintiff's

Grievance was *solely* about his inability to get a bottom bunk memo arising from medical

providers' refusal to issue the bottom bunk memo.  Warden Blades and the other IDOC

Defendants clearly relied on the medical providers' opinions to deny the Grievance and

affirm denial on appeal.  None of the IDOC Defendants relied on anything *except* the

medical providers' opinion.  The IDOC Defendants' absence of any nonmedical-based act

or omission that would support application of the second exclusion of the duty-to-defend

provision in refusing to assign Plaintiff to a bottom bunk without a "bottom bunk memo"

is made clear in Warden Blades's only statement on the Grievance, which was, "Concur

with medical response."  *Grievance attached to Complaint* (Docket No. 3, p. 11).

---

[22]  Two "bottom bunk memos" were submitted by PHS in support of its Motion for
Summary Judgment against Plaintiff (Docket No. 36-6, pp. 42-43).  The official title is
"Offender Medical Status Report."  It bears the PHS logo and name at the top lefthand corner.  It
states: "This report indicates current medical status, changes, and/or updates regarding the above
named offender and supersedes all previous Medical Status Reports."  It indicates whether the
inmate is entitled to any of a list of deviations from regular inmate privileges or requirements,
and gives an expiration date, including, for example, "Recreation Restriction," "Medical Lay
In," "Medical Idle," "Lower Bunk," "Work Limitation," or "Meals in Tier/Unit."  The form is to
be signed by "Medical Staff," and has a line for the medical person's signature. There is also a
"cc" or "carbon copy" note printed at the bottom of the form indicating a fill-in-the-blank for the
inmate's unit number, with copies to go to any of the following, as applicable: "Unit Sergeant,
Inmate, Recreation, DW Security, Food Services, Laundry, Social Worker, or Control."
    The second of these bottom bunk memos shows that on 01-13-05, "Lower Bunk" is
circled; the box marked "Add" is checked; the remarks are "Back pain secondary to medical
problem"; and the expiration date is 01-13-06.  This particular memo is not at issue (because
none was issued and that is what Plaintiff was grieving and suing over, but it is merely an
illustration of the complete control the medical unit has over whether an inmate can be assigned
a bottom bunk for a medical reason.

**MEMORANDUM DECISION AND ORDER  37**

Based on the foregoing, the Court finds that the contract provision at issue is not ambiguous.  The Court concludes that a reading of the Complaint and its exhibits made it clear that PHS's duty-to-defend provision of the contract arose in favor of the IDOC Defendants when the suit was filed.  Accordingly, the IDOC Defendants are entitled to summary judgment on their claim that PHS is oblgated to pay their costs associated with the defense of these claims.

## SUMMARY AND CONCLUSION

All of the PHS and CMS individual defendants are entitled to summary judgment, as is Professional Medical Services, Inc.  The Motion for Summary Judgment on the policy-based claims against Correctional Medical Services, Inc. is conditionally granted, given that the Court cannot discern from Plaintiff's briefing whether he has any specific evidence to support his policy-based claim.  Plaintiff is ordered to provide specific, admissible evidence to support his policy-based claim against CMS, and the Court will reconsider its ruling on the claims against CMS, Inc.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that the PHS Defendants' Motion for a Protective Order (Docket No. 65) is GRANTED.

IT IS FURTHER HEREBY ORDERED that the CMS Defendants' Motion to Dismiss or for Summary Judgment (Docket No. 42) is GRANTED as to Plaintiff's claims against Jo Blakeslee, Rona Siebert, Paul Torrez, and Steven Sherbondy, and it is CONDITIONALLY GRANTED as to Plaintiff's claims against CMS, Inc.

**MEMORANDUM DECISION AND ORDER  38**

IT IS FURTHER HEREBY ORDERED that the IDOC Defendants' Motion for Summary Judgment against Plaintiff (Docket No. 44) is GRANTED.

IT IS FURTHER HEREBY ORDERED that the PHS Defendants' Motion for Summary Judgment against Plaintiff (Docket No. 36) is GRANTED.

IT IS FURTHER HEREBY ORDERED that the IDOC Defendants' Motion for Summary Judgment on Cross-Claim against PHS (Docket No. 45) is MOOT in part and GRANTED in part.  PHS shall pay the IDOC Defendants' defense costs on the bottom bunk memo claims, not to include the attorney's fees or salaries of the Idaho Deputy Attorney Generals who provided an actual defense in this case.

IT IS FURTHER HEREBY ORDERED that Plaintiff shall provide admissible evidence supporting his policy-based claim against CMS no later than **April 30, 2008.** Plaintiff is reminded that discovery is now closed, and thus he must provide what he has and not try to obtain new discovery or speculate as to what else might be available.  CMS, Inc., may file a responsive brief fourteen days thereafter.

DATED:  **March 14, 2008**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER  39**